UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 9:19-cv-80872-ROSENBERG/BRANNON

NORTH PALM MOTORS, LLC,
*doing business as Napleton's*
*Car Rental Center*,

    Plaintiff,

v.

GENERAL MOTORS LLC,

    Defendant.
_____/

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendant General Motors LLC's ("GM") Motion for Summary Judgment. DE 85. The Court has carefully considered the Motion, Plaintiff North Palm Motors d/b/a/ Napleton's Car Rental Center's ("Napleton") Response thereto [DE 95], Defendant's Reply [DE 98], and the record and is otherwise fully advised in the premises. For the reasons set forth below, the Motion for Summary Judgment is **DENIED**.

This case is about a rental car company that ordered cars from GM for its inventory of rental cars. However *which* rental car company ordered the cars is very much in dispute and, as discussed below, is the central factual issue presented on summary judgment. Napleton contends that it ordered the cars and that GM diverted those cars to a competitor rental car company, Custom Fleet Services d/b/a Auto Rentals of the Palm Beaches ("Auto Rentals"), causing Napleton damage. GM contends that Auto Rentals ordered the cars and that, therefore, GM appropriately delivered the cars to Auto Rentals.

## I.     FACTUAL BACKGROUND

Napleton was a rental car company that purchased GM manufactured cars for its inventory of rental cars. DE 86 and 96 ¶¶ 1-2. During the relevant time period, GM's practice was to negotiate the terms of a written contract for a purchase of cars for each model year—called a Model Year Agreement—with Napleton. DE 96 and 97 ¶ 54. However, GM allowed Napleton to order cars, and GM built those cars, before the Model Year Agreement was signed. *Id.* ¶¶ 54, 55.

Napleton placed its orders for GM cars through authorized GM dealers, which ordered the cars from GM. DE 86 and 96 ¶¶ 3-4. Napleton then paid the authorized GM dealers for the cars; GM did not accept payment directly from Napleton. DE 96 and 97 ¶ 57. Napleton historically used Ed Morse Cadillac and Schumacher Chevrolet as its authorized GM dealers. DE 86 and 96 ¶ 4. George Bengston was the National Fleet Account Manager of Schumacher. *Id.* ¶ 5. Napleton used a unique six-digit Fleet Account Number ("FAN") to order GM cars. *Id.* ¶ 6.

Ed Napleton was Napleton's CEO; Bruce Etheridge was its COO; Ken Stevens was its CFO; Jim Priegel was its Director of Dealership Operations; Eddie Napleton was its Regional Dealership Manager; and Rick Boyce was Napleton's Manager. *Id.* ¶¶ 11, 13. Boyce was responsible for ordering cars from GM. *Id.* ¶ 34. He decided on strategy for ordering cars each year and communicated that strategy to Priegel. *Id.* ¶ 16. Boyce, Priegel, and Ed Napleton then together made the decision about what cars to purchase. *Id.* Napleton purchased GM cars for model years 2013, 2014, and 2015, and the parties signed Model Year Agreements for those years. *See* DE 86-5; DE 86-6; DE 86-7.

Jared Jenson was the GM representative responsible for negotiating a purchase of 2016 model year GM cars with Napleton. DE 86 and 96 ¶ 22. Jenson and Boyce began to negotiate in 2015. *Id.* ¶¶ 23, 24; *see, e.g.*, DE 96-3; DE 96-20. On July 20, Priegel emailed Ed Napleton, "I

2

had a discussion with Rick Boyce about keeping the rental fleet in the 300 unit range that you mentioned, he is going to get pricing finalized and I will discuss with you before we pull the trigger." DE 96-5.  In August and September 2015, Boyce told Jenson that Napleton was changing its name to Auto Rentals and that Bengston would "be involved" with Auto Rentals.  DE 86 and 96 ¶ 25; *see also* DE 86-3 at 6, 10-11; DE 96-30.

Several emails are relevant to what transpired during the fall of 2015.  On August 1, Priegel emailed Boyce, "When we spoke on Thursday, you said you were going to email the order on Friday morning??  Hopefully you simply left me off of the distribution list and you and Eddie handled it as you told me yesterday was the last day to order, please advise."  DE 86-22.  Priegel again emailed Boyce on August 12 stating, "Where are we at on your GM orders, not sure why I haven't heard from you??"  DE 86-23.  That same day, Priegel emailed Eddie Napleton that he had "no idea how [Boyce] is going to run the rental company without cars," and Priegel directed Eddie Napleton to visit Boyce to "find out where we are at on cars for [the] fall."  DE 86-24.  On August 13, Boyce emailed Ed Napleton:

> After discussions with GM we must provide a 400 unit order to qualify for the 325k incentive. . . . We are past the deadline to order cars and getting these in quickly is imperative.  I have spoken with both [Priegel] and Eddie [Napleton] and they have advised me to let you know.  Please advise.

DE 86-25.

The following day on August 14, Boyce emailed Patti Manning, a fleet manager for Ed Morse.  DE 96-23; *see also* DE 86 and 96 ¶¶ 3-4.  The signature space on Boyce's email listed him as "Director" of "Napleton Rent-a-car."  DE 96-23.  Boyce asked Manning to order 75 GM cars and to call him "to confirm."  *Id.*  He stated, "Let this serve as your po for this transaction."[1]  *Id.*

---

[1] It is undisputed that "po" means purchase order.  *See* DE 96 and 97 ¶ 64.

3

This order was placed using Napleton's FAN. DE 86-3 at 5-6. On August 17, Manning sent Boyce a confirmation of the order of 75 cars in the form of spreadsheets that included Napleton's FAN. DE 96-7.

Also on August 17, Priegel emailed Ed Napleton, "[Boyce] is working on GM to see if we can get vehicles and we discussed a plan 'B' if we can't. If we can't purchase any inventory for Fall season, we probably should just wind down the operation." DE 86-26. Priegel asked Boyce on August 21, "What is the latest on potential GM cars for fall? What if any is plan 'B,' waiting on you." DE 86-27. Stevens asked Boyce on August 22, "What is going on?" and "Were we able to get cars ordered?" DE 86-28. Stevens emailed Boyce again on August 27 asking, "Should I tell Ed that we have no cars or plans to continue business?" DE 86-29. On August 31, Priegel asked Boyce, "What is the plan for the fall?? The clock is ticking if not expired!" DE 86-30. Boyce responded to Priegel later that day by stating, "I have placed a few orders to see where we will end up as far as production." DE 96-4.

On September 4, Priegel asked Boyce, "Any further news on inventory for fall??" and Stevens asked Boyce on September 11, "Any updates on rental fleet inventory?" DE 86-31; DE 86-32. Priegel asked Boyce on October 1, "What's the plan for [the] season???" DE 86-33. Etheridge asked Boyce on October 15, "Can you please explain what you are doing? I asked you a month ago without an answer." DE 86-34. On October 23, Etheridge emailed Priegel, copying Boyce, "What is out plan for the upcoming year with rental cars? We will have customers soon so need to decide what we are doing. . . . Please get with [Boyce] and get a plan for all to agree on." DE 86-35. On October 28, Priegel emailed Eddie Napleton and directed him to visit Boyce and "conference on what if anything we are going to do this fall with the rental company." DE 86-36. That same day, Priegel also emailed Etheridge, "There is no plan in place for vehicles

4

for this fall that I am aware of, we were on hold waiting for approval to do the GM deal again this year and missed out on their allocation and they were not as interested in the lower number as well." DE 86-37.

Also during the fall of 2015, Bengston ordered 2016 model year GM cars using Napleton's FAN. DE 86-18 at 5-6, 14; *see* DE 96-9; DE 96-33. Auto Rentals paid for the cars that Bengston ordered and for the 75 cars that Boyce had ordered. DE 86 and 96 ¶ 28; DE 86-18 at 14. In October, Jenson distributed by email a spreadsheet showing that a total of 320 cars had been ordered using Napleton's FAN. DE 96-33. The spreadsheet showed that the 320 cars had status codes of 3000 or higher, with a status code 3000 meaning that the order for the car had been accepted. *Id.*; DE 96-10 at 6-7. GM and Boyce signed a 2016 Model Year Agreement before the end of 2015. DE 86-20. Boyce signed the 2016 Model Year Agreement as Rental Manager for Auto Rentals. *Id.* at 5.

Boyce would later aver in a sworn affidavit that, around May 2015, he submitted a proposal to Priegel for Napleton to purchase new cars, but Priegel instructed him "to not order any new vehicles until further notice because Ed Napleton Sr. was 'deciding what he's doing' about the car rental business." DE 97-2 ¶ 4. Priegel repeated the instruction "not to do anything, or place any order" to Boyce in June 2015. *Id.* ¶ 6. Boyce "received no further direction or authorization with regard to the ordering of new cars from Napleton management." *Id.* ¶ 7. Ed Napleton told Boyce and other Napleton employees in July 2015 that Napleton was losing money and that the business would be closing. *Id.* Boyce again submitted a proposal for Napleton to purchase GM cars to Priegel in August 2015, but Boyce had "no further communication . . . or discussions" with Priegel "relative to these issues." *Id.* ¶ 8. He "received no direction or authorization from Napleton to purchase new vehicles" over "the course of the next 4-5 months." *Id.* ¶ 9. Instead, Eddie Napleton

5

asked him in late 2015 to stay for a few months to help "wind the business down" and to sell or return the existing inventory of rental cars. *Id.* ¶ 10. In addition to providing these statements via affidavit, Boyce testified during an evidentiary hearing in a separate legal proceeding that he did not get authority from Priegel to order cars and that he received a message from Priegel explaining not to order cars. DE 86-14 at 4.

Bengston testified at a deposition that Napleton did not order cars for the 2016 model year and that Boyce's "boss" told him not to order cars. DE 86-18 at 4-5. The cars that Bengston ordered using Napleton's FAN were for Auto Rentals, and he used Napleton's FAN as a "placeholder" while Auto Rentals' application for a FAN was being processed. *Id.* at 5-8, 10-11.

Priegel testified at deposition that he did not recall Boyce ever making a proposal to Napleton management for the purchase of 2016 model year cars. DE 86 and 96 ¶ 17. Priegel "never approved any plan or order for the 2016 model year." DE 86-9 at 24. As of late October 2015, Napleton was not "increasing the inventory." *Id.* at 22. Eddie Napleton testified at deposition that he did not know whether anyone authorized Boyce to purchase cars for Napleton in 2015. DE 86-13 at 3.

## II. PROCEDURAL BACKGROUND

Napleton filed this case in state court in June 2019, and GM subsequently removed the case to this Court based on federal diversity jurisdiction. *See* DE 1. Napleton's Second Amended Complaint raises claims of breach of contract, breach of contract implied in fact, and promissory estoppel. DE 50. The crux of Napleton's case is that it ordered 2016 model year GM cars, that GM diverted those cars to Auto Rentals, and that Napleton's business was damaged because it did not receive the cars that it had ordered. Napleton seeks damages

>for the value of the incentives that were never paid to Napleton, for losses it suffered liquidating vehicles it had to hold onto when it became apparent GM would not deliver the 2016 model year vehicles as promised, and for the value of the non-risk vehicle inventory that Napleton could not find elsewhere.

*Id.* ¶¶ 73, 82, 92.  GM now moves for final summary judgment.

### III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A factual dispute is 'material' if it would affect the outcome of the suit under the governing law, and 'genuine' if a reasonable trier of fact court return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008). A court ruling on a summary judgment motion views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016).  The court does not weigh conflicting evidence or make credibility determinations.  *Id.*  Upon discovery of a genuine dispute of material fact, the court must deny summary judgment and proceed to trial.  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012).

If the movant shows that there is no genuine dispute as to a material fact, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial.  *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018).  The non-moving party does not satisfy this burden "if the rebuttal evidence is merely colorable, or is not significantly probative of a disputed fact."  *Jones*, 683 F.3d at 1292 (quotation marks omitted).  "Conclusory allegations and speculation are insufficient to create a genuine issue of material fact."  *Glasscox v. City of Argo*, 903 F.3d 1207, 1213 (11th Cir. 2018).  The non-moving party must "make a showing

7

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Jones*, 683 F.3d at 1292 (quotation marks omitted).

## IV. ANALYSIS

GM contends that it is entitled to final summary judgment because there was no contract between the parties for Napleton to purchase 2016 model year cars and no promise by GM to provide Napleton with 2016 model year cars. The central factual issue on summary judgment is whether, when Boyce and Bengston ordered 2016 model year GM cars, they did so for Napleton or for Auto Rentals. GM makes several legal arguments—no meeting of the minds, lack of consideration, lack of a promise and reliance, and failure to satisfy the Statute of Frauds—that revolve around this central factual issue.

As an initial matter, the parties dispute which state's substantive law applies here. Napleton argues that Michigan law applies; GM argues that Florida law applies. A federal court exercising jurisdiction based on diversity of citizenship applies the choice-of-law rules of the forum state to determine what substantive law governs. *U.S. Fid. & Guar. Co. v. Liberty Surplus Ins. Corp.*, 550 F.3d 1031, 1033 (11th Cir. 2008). The legal issues that GM raises on summary judgment are those of contract formation and validity. Florida applies the *lex loci contractus* doctrine to determine choice of law for issues of contract formation and validity. *Trumpet Vine Invs., N.V. v. Union Cap. Partners I, Inc.*, 92 F.3d 1110, 1119 (11th Cir. 1996); *Hammett v. Am. Bankers Ins. Co. of Fla.*, 203 F.R.D. 690, 700 (S.D. Fla. 2001). Under that doctrine, "issues concerning the validity and substantive obligations of contracts are governed by the law of the place where the contract is made." *Trumpet Vine Invs.*, 92 F.3d at 1119. "A contract is made where the last act necessary to complete the contract is performed." *Id.*

8

It is black letter law that a contract is made upon the acceptance of an offer. *See, e.g.*, Restatement (Second) of Contracts § 22 (Am. L. Inst. 1981). Here, the alleged contract was made when GM (doing business in Michigan) accepted Napleton's (doing business in Florida) offer to purchase cars.

GM acknowledges that the law of the state where the contract was made governs, but GM then provides no factual or legal argument to show how the alleged contract was made in Florida. *See* DE 98 at 3. GM instead argues that Florida law should apply because the alleged contract was breached in Florida when the cars were not delivered to Napleton, because Napleton would have performed on the contract by making payment in Florida, and because the cars were intended for use by customers in Florida. *Id.*

The Court takes no position at this time as to the choice of law that may govern issues involving performance of the alleged contract. The Court determines only that Michigan law governs the issues that GM has raised on summary judgment concerning contract formation and validity because the alleged contract was made in Michigan.[2]

Turning to the central factual issue on summary judgment, GM points to numerous pieces of evidence to demonstrate that Boyce and Bengston ordered 2016 model year GM cars for Auto Rentals, not for Napleton. There are various emails from Napleton employees to Boyce asking whether he had any plan for purchasing 2016 model year cars. *See, e.g.*, DE 86-27; DE 86-29; DE 86-30; DE 86-33; DE 86-35. An email from Priegel in late October indicates that there was

---

[2] Under Florida law, issues of contract performance are governed by the law of the place where the contract was to be performed. *OJ Com., LLC v. Ashley Furniture Indus., Inc.*, 359 F. Supp. 3d 1163, 1172 (S.D. Fla. 2018), *aff'd*, 817 F. App'x 686 (11th Cir. 2020). Given the Court's ruling, the Court need not reach Napleton's alternative argument that Michigan law applies because choosing Michigan law became the parties' "course of dealing" when the 2013, 2014, and 2015 Model Year Agreements between the parties provided that Michigan law governed those Agreements. *See* DE 95 at 4.

9

"no plan" to purchase 2016 model year cars, and he testified that he never approved a plan to purchase 2016 model year cars. DE 86-37; DE 86-9 at 24. Boyce averred that he was repeatedly instructed not to order cars for Napleton and that his proposals for Napleton to purchase cars were rejected or ignored. DE 97-2 ¶¶ 4, 6-9. Bengston testified that Napleton did not order 2016 model year cars and that the cars he ordered were for Auto Rentals. DE 86-18 at 5-7.

But there is also evidence indicating that Napleton employees wanted Boyce to order 2016 model year cars and, in fact, instructed him to do so. For example, on August 1 (a Saturday), Priegel emailed Boyce stating that, when they had spoken on Thursday, Boyce said he would email an order on Friday morning and that "[h]opefully" Boyce had "handled it" and had "simply left [Priegel] off of the distribution list." DE 86-22. The next email in the record from Priegel to Boyce, dated August 12, asked, "Where are we at on your GM orders." DE 86-23. Boyce's email to Ed Napleton the next day asked Ed Napleton to "[p]lease advise" about ordering GM cars because it was "imperative" to order any cars "quickly." DE 86-25. Boyce ordered 75 GM cars the following day. DE 96-23. Approximately one week after Boyce placed that order, Stevens asked Boyce whether he had been "able to get cars ordered." DE 86-28. Boyce told Priegel about one week later that he had "placed a few orders." DE 96-4. A jury could view this evidence as demonstrating that Boyce ordered the cars for Napleton.

There continued to be emails throughout September and October asking Boyce whether there was any plan for 2016 model year cars. *See, e.g.*, DE 86-31; 86-32; DE 86-33; DE 86-35. It is unclear from this record whether the confusion in September and October was over whether Napleton had a plan to purchase any 2016 model year cars, or over whether Napleton had a plan to purchase cars in addition to the ones that Boyce had ordered in August. What is apparent from the record is that, during the fall of 2015, there were breakdowns in communication between Boyce

10

and other Napleton employees. *See, e.g.*, DE 86-23 (stating, "not sure why I haven't heard from you"); DE 86-34 (stating, "Can you please explain what you are doing? I asked you a month ago without an answer.").

In addition, even the evidence to indicate that Boyce did not order the GM cars for Napleton is contradictory. For example, Priegel testified that he did not recall Boyce ever making a proposal for the purchase of 2016 model year cars, but Boyce averred that he submitted at least two proposals to Priegel for the purchase of 2016 model year cars, which were rejected or ignored. *See* DE 86 and 96 ¶ 17; DE 97-2 ¶¶ 4, 8. Boyce averred that Priegel instructed him not to order any cars and gave him no direction about ordering cars, but there are emails from Priegel to Boyce asking for a plan to order cars. *See* DE 86-27; DE 86-30; DE 86-33; DE 97-2 ¶¶ 4, 6-9. And Priegel testified that he never approved any plan to purchase 2016 model year cars, but his August 1 email to Boyce stated, "[w]hen we spoke on Thursday, you said you were going to email the order on Friday morning" and "[h]opefully" the order had been "handled." *See* DE 86-9 at 24; DE 86-22.

Thus, on the factual issue of whether Boyce ordered 2016 model year GM cars for Napleton or for Auto Rentals, there is evidence upon which a jury could find in favor of Napleton (that the cars were ordered for Napleton) or in favor of GM (that the cars were ordered for Auto Rentals). GM argues that all of the testimony contradicts any written evidence that may be construed as indicating that Boyce ordered the cars for Napleton. Whether to credit testimony or written evidence where contradictions exist, or whether the written evidence may be interpreted in a matter consistent with the testimony, are matters for a jury to resolve. GM also argues that Napleton never, between the end of 2015 and the initiation of this lawsuit in 2019, acted in a manner consistent with a belief that it had ordered 2016 model year cars, as Napleton did not pay for any

11

cars or demand delivery when cars did not arrive. Any explanation for Napleton's purported failure to follow up on the alleged contract is also a matter for a jury to resolve.

The Court takes an opportunity to identify two issues that GM does not argue in its summary judgment briefing. First, GM does not contend that there could be no contract between the parties absent a signed 2016 Model Year Agreement. GM does not argue that, if Napleton did order cars by purchase order and GM accepted and confirmed that order, those communications were insufficient to form a contract.[3] *See* DE 96-23; DE 96-33. Second, GM does not contend that, even if Boyce ordered GM cars for Napleton, the additional cars that Bengston ordered could not be part of the contract between the parties. It is not clear from the briefing whether Boyce or any other Napleton employee played a part in ordering these additional cars, nor is it clear whether Bengston (an employee of Schumacher) had authority to bind Napleton to a contract. But GM has not, as an alternative to full summary judgment, sought partial summary judgment related to the cars that Bengston ordered. Because these two arguments have not been presented to the Court, the Court will not address them further.

For the reasons given, there is a genuine dispute of material fact as to whether Boyce ordered 2016 model year GM cars for Napleton or for Auto Rentals. The Court now turns to GM's legal arguments.

---

[3] GM does argue that, "Even assuming Boyce ordered 2016 model year vehicles for Napleton's, which he did not, there is no genuine issue of fact that essential terms, such as pricing and rebates, were never discussed, much less agreed upon, between GM and Napleton's." DE 85 at 15. GM provides no citation to record evidence to support its proposition that pricing and rebates were never discussed. *Id.* Napleton responds that the parties "had already agreed upon the incentives, and therefore the price, for the 2016 [model year] across a number of brands and trims," citing to August 2015 emails between Boyce and Jenson. *See* DE 96-22; DE 96-24. And email communications indicate that Boyce was discussing pricing and incentives with GM. *See* DE 86-25; DE 96-5. In any event, GM has not satisfied its burden to support its proposition that the parties never discussed and agreed upon pricing and rebates. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . .").

12

GM asserts that there was no contract or contract implied in fact because there was no meeting of the minds. *See Clark v. Al-Amin*, 872 N.W.2d 730, 735 (Mich. Ct. App. 2015) (stating that "a contract requires mutual assent or a meeting of the minds on all the essential terms" (quotation marks omitted)); *Mi-Tech Sales, Inc. v. Focus Enhancements, Inc.*, No. 237565, 2003 WL 1879940, *2 (Mich. Ct. App. Apr. 15, 2003) ("A meeting of the minds must exist for a contract implied in fact to be formed."). GM maintains that it is illogical that there could have been a meeting of the minds when "no one in Napleton's Management authorized the order of 2016 model year vehicles or believed 2016 model year vehicles had been ordered" and when "Napleton's was wholly unaware that 2016 model year vehicles were ordered." DE 85 at 14 (emphasis omitted). Yet, there is a genuine dispute of material fact as to whether Boyce was instructed to, and did, order 2016 model year GM cars for Napleton and then apprised other Napleton employees that he had placed the order. Given this dispute, GM is not entitled to judgment as a matter of law due to lack of meeting of the minds.

GM next maintains that there was no contract or contract implied in fact because there was no consideration. *See Yerkovich v. AAA*, 610 N.W.2d 542, 546 (Mich. 2000) ("An essential element of a contract is legal consideration."); *Auto-Owners Ins. Co. v. Robert E. McGowan Tr.*, No. 314118, 2014 WL 2040025, *3 (Mich. Ct. App. May 15, 2014) (explaining that legal consideration is a requirement of a contract implied in fact). GM argues that "Napleton's suffered no legal detriment" because it "did not believe 2016 model year vehicles had been ordered from GM." DE 85 at 15. This argument, too, depends on whether Boyce ordered 2016 model year GM cars for Napleton. If Napleton agreed, through its purchase order, to purchase 2016 model year cars, and if GM agreed, by accepting and confirming that order, to provide the cars, there was consideration. *See Vulic v. Dep't of Treasury*, 909 N.W.2d 487, 491 (Mich. Ct. App. 2017)

("Consideration is a bargained-for exchange with a benefit on one side, or a detriment suffered, or service done on the other." (quotation marks omitted)). GM also argues that Napleton never paid for any of the ordered cars. But whether Napleton ultimately satisfied its part of the bargain that it would pay for the cars, and whether it had cause not to do so, does not impact whether consideration existed. Those are matters of contract performance and breach. GM is not entitled to judgment as a matter of law due to lack of consideration.

GM contends that Napleton cannot succeed with its promissory estoppel claim because there was no promise or reliance. *See Zaremba Equip., Inc. v. Harco Nat'l Ins. Co.*, 761 N.W.2d 151, 166 (Mich. Ct. App. 2008) (stating that the elements of a promissory estoppel claim are "(1) a promise (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee and (3) that, in fact, produced reliance or forbearance of that nature (4) in circumstances requiring enforcement of the promise if injustice is to be avoided"). GM argues that it made no promise to build or deliver 2016 model year cars for Napleton, but that argument again implicates the factual issue of whether GM accepted and confirmed an order by Napleton to purchase cars. GM also argues that Napleton did not rely on any promise by GM. Napleton responds that, because it had ordered 2016 model year GM cars, it refrained from placing orders for cars from other manufacturers until it was too late to do so. Napleton points to Etheridge's deposition testimony that "we were unable to take advantage of the Hyundai repurchase program for the 2015-2016 season" because "[i]t was too late" given "everything that happened here." DE 96-15 at 3-4; DE 96 ¶ 92. While GM counters that Napleton did purchase Hyundai cars in March 2016, GM does not argue or provide any evidence that the same benefits accompanied the March 2016 purchase as would have accompanied an earlier

14

purchase in 2015.  *See* DE 97-5 at 3-4; DE 97 ¶ 92.  Genuine disputes of material fact preclude judgment on the promissory estoppel claim.

      GM asserts that the purported contract does not satisfy the Statute of Frauds.  A

> contract for the sale of goods for the price of $1,000.000 or more is not enforceable by way of action or defense unless there is a writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker.

Mich. Comp. Laws § 440.2201(1).  A writing satisfies § 440.2201(1) if it evidences a contract for the sale of goods, if it is "'signed', a word which includes any authentication which identifies the party to be charged," and if it specifies a quantity.  *Ace Concrete Prods. Co. v. Charles J. Rogers Constr. Co.*, 245 N.W.2d 353, 355 (Mich. Ct. App. 1976) (quotation omitted).  The Statute of Frauds does not require that the entire agreement be in writing, and it may be satisfied by several separate writings made at different times.  *Kelly-Stehney & Assocs., Inc. v. MacDonald's Indus. Prods., Inc.*, 693 N.W.2d 394, 398-99 (Mich. App. Ct. 2005).  The writing may be an email with a signature affixed thereto.  *Gillis v. Wells Fargo Bank, N.A.*, 875 F. Supp. 2d 728, 734 (E.D. Mich. 2012).

      GM does not dispute that Jenson sent an email with an attached spreadsheet listing the 320 cars that had been ordered.  *See* DE 96-33.  GM does not explain why this email and spreadsheet—or any other writing or combination of writings—does not meet the requirements of the Statute of Frauds.  GM instead argues again that Napleton did not order those cars, and therefore there can be no writing evidencing a contract between the parties.  *See* DE 85 at 7-10; DE 98 at 6.  But there is a genuine dispute of material fact on that point.  GM is not entitled to judgment as a matter of law due to failure to satisfy the Statute of Frauds.

In summary, each of GM's legal theories on summary judgment relies on a factual issue that is in genuine dispute, that is, whether Boyce and Bengston ordered 2016 model year GM cars for Napleton or for Auto Rentals. That factual issue precludes summary judgment.

Finally, GM makes several arguments to show that Napleton cannot recover because it suffered no loss due to GM's actions. GM first contends that Napleton is claiming "lost profits" but "never sought lost profits from GM in its Second Amended Complaint." DE 85 at 18. Napleton responds that it "pled lost profits in the Second Amended Complaint, seeking damages for lost incentives and no-risk inventory, and liquidated vehicle losses." DE 95 at 18. Thus, the parties simply differ about the meaning of the phrase "lost profits." Napleton was required to, and did, plead the relief being sought. *See* Fed. R. Civ. P. 8(a)(3) (requiring a pleading to contain "a demand for the relief sought"). Napleton sought damages in the Second Amended Complaint

> for the value of the incentives that were never paid to Napleton, for losses it suffered liquidating vehicles it had to hold onto when it became apparent GM would not deliver the 2016 model year vehicles as promised, and for the value of the non-risk vehicle inventory that Napleton could not find elsewhere.

DE 50 ¶¶ 73, 82, 92. Napleton has not sought leave to amend its damages demand, nor has Napleton provided authority for a proposition that it may seek damages at trial that are different from those pled in the Second Amended Complaint.

GM next argues that Napleton cannot demonstrate that GM caused any losses. GM argues that Napleton's losses are instead attributable to the wrongful actions of others, as demonstrated by the fact that there are state criminal charges pending against Boyce and his assistant for their alleged actions related to Napleton and the fact that Napleton has sued individuals and entities including Auto Rentals, Bengston, Boyce, and Boyce's assistant in state court. *See State v. Boyce*, 2019CF009887 (Fla. Cir. Ct. in and for Palm Beach Cnty.); *North Palm Beach Motors, LLC v.*

16

*Custom Fleet Servs., Inc.*, 2016CA001515 (Fla. Cir. Ct. in and for Palm Beach Cnty.).  Those state criminal and civil cases are ongoing, and the parties have not briefed whether any allegations, admissions, or findings in those cases are binding in this action.  Even if any allegations, admissions, or findings in those cases are binding in this action, GM has not explained, as a matter of law, how they demonstrate that Napleton cannot prove causation.  Whether GM caused any of Napleton's purported losses remains a genuine issue of material fact.

GM asserts that "Napleton's own 30(b)(6) deponent testified that [Napleton] never experienced any lost profits," as "the witness testified that Napleton's was never unable to fill an order due to lack of product."  DE 85 at 19.  The deposition testimony that GM cites does not support its own assertion.  The deponent, Etheridge, in fact testified that he was "sure there were customers turned away" during 2016 due to a lack of cars, that Napleton "did not have cars for customers that came in" for an unspecified period of time, and that Napleton "needed to scurry to get cars so the customers weren't turned away."  DE 86-21 at 4-5.

Lastly, GM maintains that "Napleton's claim for lost profits fails because Napleton's did nothing to mitigate its damages."  DE 85 at 19.  To support this contention, GM cites Napleton's interrogatory admission that, "Napleton became aware of [Boyce's] plan to create another rental car company on February 10, 2016.  Napleton informed GM on or around August 31, 2016."  DE 86-12 at 6.  GM asserts that this admission shows that Napleton failed to mitigate its damages because, "[r]ather than take immediate action to reach out to GM regarding the availability of vehicle inventory to support its alleged need, Napleton's waited until August 2016 to alert GM."  DE 85 at 19.  GM does not provide evidence on such issues as when Napleton discovered that the cars it purportedly had ordered would not arrive, what Napleton might have done at that time to mitigate its losses, what GM could or would have done had it been alerted to the issue earlier, or

17

whether Napleton could have mitigated its losses in whole or only in part.  In short, GM has not carried its burden to show that it is entitled to summary judgment on its mitigation affirmative defense.

## V. CONCLUSION

For the foregoing reasons, GM's Motion for Summary Judgment [DE 85] is **DENIED**.

This case is referred to Magistrate Judge Dave Lee Brannon for a Settlement Conference to be held as soon as is practicable.  Absent extenuating circumstances, the Settlement Conference shall be completed by the end of November 2020.  Judge Brannon will set the date and time of the Settlement Conference by separate Order.  The parties shall file a joint notice of the outcome of the Settlement Conference within one (1) business day of the completion of the Conference.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 30th day of October, 2020.

_____
ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to: Counsel of Record