UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 9:19-cv-80872-RLR

NORTH PALM MOTORS, LLC, d/b/a
NAPLETON'S CAR RENTAL CENTER

     Plaintiff,

v.

GENERAL MOTORS LLC,

     Defendant.

_____/

**JOINT PRETRIAL STIPULATION**

Pursuant to the Court's Order Setting Trial Date and Pretrial Deadlines (ECF No. 144), Plaintiff North Palm Motors d/b/a Napleton's Car Rental Center ("Napleton") and Defendant General Motors LLC ("GM") (collectively, "the Parties") file this Joint Pretrial Stipulation.

1. **A Short Concise Statement of the Case**

   a. **Plaintiff**

Napleton was a highly successful motor vehicle rental company in South Florida, which focused on renting vehicles to seasonal residents and vacationers. Over the years, Napleton grew the business substantially, establishing a solid base of repeat customers. The business was profitable on an operational cash-flow basis.

Every year beginning in 2010, Napleton would order rental vehicles from GM using a Fleet Account Number, or "FAN." The assignment of a FAN is the means through which GM qualifies customers to order rental inventory. Napleton, like all GM customers in the ordinary course of GM's business, was required to obtain a FAN as a pre-condition for placing orders for rental

inventory in bulk and to qualify for repurchase programs and other incentives worth hundreds of thousands of dollars.

For every year from 2010-2015 the following sequence occurred: 1) Napleton ordered vehicles from GM for the upcoming rental season; 2) GM accepted Napleton's orders; 3) GM built the vehicles and shipped them to franchised GM dealers for delivery to Napleton; and 4) after GM built, shipped, and delivered Napleton's vehicles, GM and Napleton memorialized their agreement by a formal written contract. In other words, offer, acceptance and at least partial performance all occurred prior to executing a written agreement memorializing the arrangement. This sequence was identical for 2016 Model Year ("MY") vehicles, except for one thing – ***GM diverted all of Napleton's orders to a competing rental business minutes from its location called Custom Fleet Services, Inc. d/b/a Auto Rentals of the Palm Beaches ("Auto Rentals").*** Auto Rentals was a scheme concocted by Rick Boyce, the manager of Napleton's Car Rental Center at the time, and George Bengston, the Fleet Account Manager at Schumacher Automotive Group. GM knew that Rick Boyce worked for Napleton and that George Bengston worked for Schumacher.

At first, the process of ordering vehicles unfolded as it had in previous years. On May 4, 2015, Jared Jenson (GM's Rental Sales Operations Manager) emailed the 2016 MY offer presentation for Napleton to Rick Boyce. Napleton authorized Boyce to negotiate with GM and order 2016 MY vehicles on Napleton's behalf. On June 8, 2015, Jenson sent Boyce an email attaching a schedule and due dates for 2016 MY orders. In August 2015, Boyce placed orders for GM vehicles ***using Napleton's FAN and under Napleton's name***. On August 31, 2015 Boyce informed Jim Priegel (Napleton's Director of Dealership Operations) that he had ordered 2016 MY vehicles from GM. Boyce also had conversations with Eddie Napleton (Napleton's Regional Dealership Manager), informing him that cars had been ordered and would arrive soon. On

September 15, 2015, Patti Manning, the fleet manager for Ed Morse Cadillac, emailed Rick Boyce and Carolyn Barlow (Regional Controller at Napleton) attaching the invoices for the 2016 Cadillacs ordered by Boyce, and stating that "[t]hese cars are showing a dealer ETA of September 28 thru October 6." Thus, there is record evidence that: 1) Napleton ordered 2016 MY vehicles from GM; 2) Napleton's management knew that cars had been ordered from GM; and 3) and GM accepted and built those orders. Specifically, a total of 320 vehicles were ordered using Napleton's FAN.

However, GM transferred all of Napleton's 2016 MY vehicle orders over to Auto Rentals, the competing rental company formed by the Schumacher Automotive Group and managed by Rick Boyce and George Bengston. Boyce and Bengston's plan was straight-forward: instruct GM to transfer all of Napleton's orders over to Auto Rentals, leaving Napleton with no cars to rent to its customers. Then Auto Rentals could step in to fill the void, renting 2016 MY vehicles to Napleton's (previous) customers, effectively transporting an entire customer base from one company to another in a matter of months. It took little to persuade GM to transfer Napleton's orders: it did so solely based on Bengston's and Boyce's request and took their statements to be true at face value. Indeed, there are numerous emails in which GM talks about transferring vehicles ordered by Napleton to Auto Rentals. For example, on September 30, 2015, Jared Jenson emailed two GM employees stating that, "…as you know, Napleton has already started ordering cars under its FAN 425899, but has not taken delivery of any of them yet. Napleton will be obsolete going forward, and Auto Rentals will be taking on the vehicles."

GM actions were also contrary to its established policies and procedures. GM does not allow GM dealers or ***companies affiliated with GM dealers*** to have FANs. Auto Rentals was created by, and wholly owned by, Schumacher Automotive Group, a GM dealer in Palm Beach,

Florida. Auto Rentals should have never received a FAN (or be allowed to use Napleton's FAN) in the first place. GM knew something improper was going on. Indeed, internal e-mails from GM personnel confirm that Bengston's request for a FAN for Auto Rentals raised red flags. When George Bengston first requested a FAN for Auto Rentals, a GM employee named Don Kaiser (GM's Customer Support Team Manager) stated the following: " … is this new location connected in any way to the dealership? Looks like new address is in different city. Is there a business certificate or state license for this new business? I am concerned that George Bengston signed the form as the customer AND as the dealer rep. As you know we do NOT create FANs for dealer rental or leasing companies." In response, another GM employee named Tara Arwood responded as follows: "Yes. Both addresses are associated with GM Dealerships/Auto companies. There is a reg business for Custom Fleet Services, but not for Auto Rentals of the Palm Beaches. ***Note Schumacher is a registered agent of Custom Fleet Serv.*** George indicates the purpose of this business is to provide rental cars for multiple dealerships." (emphasis added). Other GM employees are copied on this correspondence, including Jared Jenson, Bill Schlander (Sales and Rental Operations Manager), and Patrick Wellinski (Fleet and Commercial Forecast and Production Planning). Despite the fact that it clearly violated their own policies and procedures, despite Ms. Arwood's statement that Schumacher is a registered agent of Custom Fleet Services, GM created a FAN for Auto Rentals. And, shortly thereafter, GM transferred all of the vehicles ordered under Napleton's FAN over to Auto Rentals' new FAN.

Fast forward to eight months later, Ms. Arwood terminated Auto Rentals' FAN due to the affiliation with Schumacher Automotive Group. In response to this news, Jim Puff (Southeast Region's Commercial Zone Manager stated the following: "…the GM Fleet Action Center must reach out to the field team and conduct some investigation before arbitrarily cancelling a FAN.

This will save everyone a ton of time … By the way, Ed Peper[1] is very good friends with Chuck Schumacher and George Bengston, since they are the largest Commercial Business Elite dealership in FL. Ed Peper, Jeff Haag, Pat Dempsey and I recently recognized Chuck Schumacher, George, Bengston and the Commercial Team with a Recognition Awards Dinner for #1 in Commercial Sales in the District and #1 Commercial sales leader in FL … As Tara Arwood states there are 171 orders that MUST NOT be cancelled or we ALL will have a HUGE problem on our hands…" Per Jim Puff and Don Kaiser's instruction, Auto Rentals' FAN was immediately reinstated. In short, GM repeatedly broke its own rules to benefit Schumacher and its affiliated companies, including Auto Rentals.

GM has stated that it thought Napleton was undergoing "just a simple name change", *i.e.*, changing its name from Napleton Rent-A-Car to Auto Rentals of the Palm Beaches. GM's statements lack credibility and is contradicted by record evidence. As outlined above, GM knew there was more than a name change and allowed a GM dealer's affiliate to get a FAN. Moreover, the so-called "name change" also included: 1) changing the delivery address; 2) changing the ownership; 3) changing bank account information; 4) the need for a new Fleet Account Number; and 5) the need to re-invoice the vehicles to the "new" company. Even the smallest amount of due diligence would have revealed that Napleton was not changing its name and that Boyce was colluding with Napleton's competitor. Instead, GM turned a blind eye to the obvious, and transferred all of Napleton's orders over to Auto Rentals. The result was the complete loss of Napleton's inventory and customer base, and the ultimate destruction of its rental car business.

Despite its best efforts to recover, Napleton closed its doors in 2018. The opening of Auto Rentals, and the demise of Napleton, was only possible because of GM's actions. Without the cars

---

[1] Ed Peper is the U.S. Vice President of GM Fleet.

from GM, Auto Rentals' plan never materializes, Napleton's business is never destroyed, and this litigation never happens.

### b. **Defendant GM**

Napleton is a former daily rental car company in West Palm Beach, Florida that purchased some of its vehicles over time from GM (through authorized dealers). GM's sole point of contact at Napleton was its Rental Car Manager, Richard ("Rick") Boyce, who was responsible for ordering vehicles from GM and then negotiating and signing the operative written contract each year, known as a Model Year Agreement ("MYA"). These MYAs governed the commercial terms of Napleton's purchase of GM vehicles for each particular model year, including the make, model, and number of vehicles Napleton agreed to purchase, along with any agreed upon incentives. Each MYA was different and separate from the contract for the previous model year to reflect the terms of the Parties' agreement for a particular model year of vehicles. These terms thus were modified each year depending on the Parties' preferences and Napleton's demand/GM's supply. Although GM and Napleton negotiated and executed MYAs for 2013, 2014, and 2015, GM and Napleton did not reach any such agreement for the 2016 model year.

Specifically, with regard to GM 2016 model year vehicles, Boyce on behalf of Napleton began negotiations with GM in February 2015. By June 2015, Napleton had yet to place its orders for the 2016 MY. Accordingly, Jared Jenson (GM's then Rental Sales Operations Manager) advised Boyce that any orders needed to be placed as soon as possible to guarantee a timely production. Still by July 2015, Boyce still had not received the necessary authorizations from Napleton's corporate management to place any 2016 model year vehicle orders from GM. In fact, Boyce's boss, Jim Priegel (Napleton's Director of Dealership Operations), instructed Boyce not to place any orders for 2016 model year vehicles pending further discussions. Boyce never received

approval to order 2016 model year vehicles and was instead informed by Napleton's Chief Executive Officer, Edward F. Napleton, Sr., on a conference call on August 14, 2015 that he planned to close the rental business due to its lack of profitability.

Indeed, Napleton was not consistently profitable year to year and did not turn a profit from 2011 to 2014. In 2013, one of the worst years for the business, and less than two years before GM's alleged breach of contract for 2016 model year vehicles, Napleton operated at a total loss of $451,487. In February 2015, during what is considered "peak season" for a car rental business in South Florida, Napleton was barely profitable, operating at a profit of just $29,577, which represented an approximate 40% downturn in profits from February 2014. The overall outlook of the business at around the time of the August 14, 2015 conference call when Napleton's CEO indicated that he planned to close the rental business was bleak: Napleton was operating at a total loss of $900,693 by September 2015 and had experienced a greater than 45% decline in revenue compared to the same period of time the year prior.

Accordingly, Boyce never placed any orders for GM 2016 model year vehicles on behalf of Napleton. Instead, and while still working for Napleton, Boyce began working for a new, competing rental car company, Custom Fleet Services. In fall 2015, Boyce and George Bengston ordered 320 GM 2016 model year vehicles for Custom Fleet Services. But, according to Bengston, because Custom Fleet Services did not yet have its own Fleet Account Number ("FAN"), a code used by fleet customers to purchase fleet vehicles from GM, he used Napleton's FAN as a "placeholder." Boyce told GM that Napleton was changing its name to Custom Fleet Services. GM and Custom Fleet Services—not Napleton—later memorialized these vehicle orders through a 2016 MYA, which Boyce signed on behalf of Custom Fleet Services—not Napleton. The 2016

7

GM MY vehicles were then paid for by, and delivered to, Custom Fleet Services. Napleton never paid for a single GM 2016 model year vehicle.

On February 10, 2016, Boyce left Napleton's employment after Napleton hired his replacement, Erik Lowery. Napleton shortly thereafter sued Boyce and other affiliated actors for purportedly stealing its customer lists and financial information for use at Custom Fleet Services (hereinafter "State Court Lawsuit" [which remains pending] and "State Court Defendants"). In the State Court Lawsuit, Napleton seeks damages in the amount of its lost profits for the period of mid-2015 through 2033. Napleton seeks the same damages, among others, in this lawsuit from GM. But without customers to whom to rent after Boyce took those customers to Custom Fleet Services, GM's supply of 2016 model year vehicles to Napleton would have been of no use. Napleton has not identified a single customer turned away from its business during the 2015-16 rental season due to a lack of GM 2016 model year vehicles in its inventory. Moreover, Napleton failed to take reasonable actions to offset any financial losses, regardless of the source, and did not even notify GM of this situation until August 2016 when a different Napleton employee (not Boyce) contacted GM to order vehicles for Napleton. In sum, the causes for the "ultimate destruction" of Napleton's business in 2018 are many, ranging from the lack of adequate management to poor financial decisions, but none involve GM.

### 2. The Basis of Federal Jurisdiction

This Court has jurisdiction under 18 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and the action is between citizens of different states.

### 3. The Pleadings Raising the Issues

The operative pleadings are Plaintiff's Third Amended Complaint (ECF No. 121) and Defendant's Answer and Defenses to Plaintiff's Third Amended Complaint (ECF No. 122).

**4. A List of All Undisposed Motions or Other Matters Requiring Action by the Court**

Defendant's Motion for Partial Summary Judgment on Plaintiff's Claims for Lost Profit Damages (ECF No. 145) is fully briefed and pending before the Court.

**5. A Concise Statement of Uncontested Facts Which Will Require No Proof At Trial, With Reservations, If Any**

The Parties do not agree that each of the undisputed facts listed below is relevant or otherwise admissible at trial. Therefore, the Parties each reserve their rights to object or otherwise contest the admission of these facts on evidentiary grounds.

1. Napleton was a limited liability company duly organized under the laws of the State of Illinois, with a principal place of business at 3636 Northlake Boulevard, Lake Park, Florida.

2. GM is a limited liability company duly organized under the laws of the State of Delaware, with its headquarters at 300 Renaissance Center, Detroit, Michigan.

3. Napleton was a daily motor vehicle rental car company in South Florida that rented vehicles to seasonal residents and vacationers in the area, as well as livery customers.

4. Napleton purchased its rental car inventory from automobile manufacturers, including GM.

5. GM is in the business of manufacturing and selling automobiles. One aspect of GM's business is sales to fleet operators such as Napleton.

6. Because Napleton was not an authorized GM dealer, it could not purchase vehicles directly from GM. Instead, an authorized GM dealer ordered the vehicles that Napleton wished to purchase from GM on Napleton's behalf.

7. Napleton historically placed orders for GM vehicles through two GM franchised dealerships – Ed Morse Cadillac and Schumacher Chevrolet.

9

8. George Bengston ("Bengston") was the National Fleet Account Manager at Schumacher Chevrolet.

9. In 2015, Jared Jenson ("Jenson") was the GM Fleet representative responsible for negotiating the potential purchase of 2016 MY vehicles with Napleton.

10. As of July 2015, Napleton's management with input into Napleton's operations consisted of Ed Napleton (CEO), Bruce Etheridge (COO), Ken Stevens (CFO), Jim Priegel (Director of Dealership Operations Including Napleton), and Eddie Napleton (Regional Dealership Manager).

11. Napleton had a Fleet Account Number ("FAN") from GM. A FAN is a unique six-digit number that GM assigns to certain customers that purchase a sufficient quantity of vehicles. GM customers with a FAN qualify for certain incentives and can use the FAN to purchase fleet vehicles through authorized dealerships and track the vehicle orders.

12. The FAN assigned to Napleton by GM was 425899.

13. The Customer Code assigned to Napleton by GM was S1F.

14. Previously, Napleton entered into written agreements with GM to purchase 2013, 2014, and 2015 model year vehicles, i.e. a "Model Year Agreement." A Model Year Agreement outlines, among other information, the make, model, and number of vehicles a fleet customer has agreed to purchase, as well as any agreed upon incentives for each model of vehicle.

15. Boyce was Napleton's Rental Car Manager who was responsible for negotiating the terms of the Model Year Agreements, signing the Model Year Agreements on Napleton's behalf, and ordering vehicles for Napleton through GM authorized dealers.

16. Boyce reported to Jim Priegel, the Director of Dealership Operations for the Napleton Automotive Group. He also reported to Eddie Napleton in the fall of 2015.

6. **A Statement in Reasonable Detail of Issues of Fact Which Remain to be Litigated at Trial**

Plaintiff alleges three counts against GM in its Third Amended Complaint:

   I. **Breach of Contract**

   a. Whether GM and Napleton had a valid contract for 2016 MY vehicles.

   b. Whether GM materially breached that contract.

   c. Whether Napleton suffered damages as a result of GM's breach.

   II. **Breach of Contract Implied in Fact (in the alternative)**

   a. Whether GM and Napleton had a valid contract implied in fact for 2016 MY vehicles.

   b. Whether GM materially breached that contract.

   c. Whether Napleton suffered damages as a result of GM's breach.

   III. **Promissory Estoppel (in the alternative to both contract claims)**

**Napleton and GM could not come to an agreement regarding the elements of the promissory estoppel claim. Thus, both Napleton's version and GM's version are listed below.**

   **Promissory Estoppel – Napleton**

   a. Whether GM made a promise to Napleton to produce/deliver 2016 MY vehicles.

   b. Whether GM should have reasonably expected its promise to induce action of a definite and substantial character on Napleton's part.

   c. Whether GM's promise in fact produced reliance or forbearance of that nature on Napleton's part.

   d. Whether GM's promise must be enforced if injustice is to be avoided.

**Promissory Estoppel – GM**

    a. Whether GM made a clear and definite promise to Napleton to produce/deliver 2016 MY vehicles.

    b. Whether, when the promise was made, GM should have reasonably expected its promise to induce action of a definite and substantial character on Napleton's part.

    c. Whether Napleton did take some action in reliance on the promise.

    d. Whether Napleton was damaged as a result of its reliance.

Defendant will present certain defenses to these claims, including, but not limited to, the statute of frauds and a duty to mitigate damages.

7. **A Concise Statement of Issues of Law on Which There is Agreement**

    a. Michigan law governs the issues of contract formation and validity, pursuant to the Court's ruling on this issue in its October 30, 2020 Order Denying Defendant's Motion for Summary Judgment (ECF No. 106).

    b. Because Napleton's claim for breach of contract implied in fact is brought in the alternative to its breach of contract claim, it may not recover under both claims.

    c. Because Napleton's promissory estoppel claim is brought in the alternative to both contract claims, it may not recover on that claim to the extent it recovers under either contract claim.

8. **A Concise Statement of Issues of Law Which Remain for Determination by the Court**

    a. Whether Florida law or Michigan law governs issues involving performance of the alleged contract.[2]

    b. Whether Plaintiff may recover lost profit damages from GM as a matter of law based on the undisputed facts in the record.

9. **Each party's number list of trial exhibits, other than impeachment exhibits, with objections, if any, to each exhibit, including the basis of all objections to each document**

    a. Plaintiff's exhibit list is attached as Exhibit A.

    b. Defendant's exhibit list is attached as Exhibit B.

10. **Each party's numbered list of trial witnesses, with their addresses, separately identifying those whom the party expects to present and those whom the party may call if the need arises. Witnesses whose testimony is expected to be presented by means of a deposition shall be so designated. Impeachment witnesses need not be listed. Expert witnesses shall be so designated.**

    c. Plaintiff's witness list is attached as Exhibit C.

    d. Defendant's witness list is attached as Exhibit D.

11. **Estimated trial time:**

The Parties estimate that trial time will be 7 days.

12. **Where attorney's fees may be awarded to the prevailing party, an estimate of each party as to the maximum amount properly allowable:**

Plaintiff is not seeking attorneys' fees.

---

[2] In the Court's Order denying GM's Motion for Summary Judgment (ECF No. 106 at 9), the Court stated that it "takes no position at this time as to the choice of law that may govern issues involving performance of the alleged contract. The Court determines only that Michigan law governs the issues that GM has raised on summary judgment concerning contract formation and validity because the alleged contract was made in Michigan."

Respectfully submitted this 28th day of January, 2022.

| | |
|---|---|
| **ARENT FOX LLP** | **KING & SPALDING LLP** |
| By:  /s/ Charles A. Gallaer | /s/ W. Randall Bassett |
| | W. Randall Bassett (FB#0038813) |
| Charles A. Gallaer (FB#117729) | Geoffrey M. Drake (*pro hac vice*) |
| Russell P. McRory, Esq. (*pro hac vice*) | TaCara Harris (*pro hac vice*) |
| Michael P. McMahan, Esq. (*pro hac vice*) | Rania Kajan (*pro hac vice*) |
| Daisy Sexton, Esq. (*pro hac vice*) | |
| | King & Spalding LLP |
| Arent Fox LLP | 1180 Peachtree Street, N.E. |
| 1301 Avenue of the Americas, Fl. 42 | Atlanta, GA 30309 |
| New York, NY 10019 | Phone: 404-572-4600 |
| Phone: 212-484-3900 | |
| | *Attorneys for General Motors LLC* |
| *Attorneys for Plaintiff* | |