UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 9:19-cv-80872-ROSENBERG/MATTHEWMAN

NORTH PALM MOTORS, LLC,
*doing business as Napleton's
Car Rental Center*,

  Plaintiff,

v.

GENERAL MOTORS LLC,

  Defendant.
_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR LOST PROFIT DAMAGES**

  This matter comes before the Court on Defendant General Motors LLC's ("GM") Motion for Partial Summary Judgment on Plaintiff North Palm Motors d/b/a/ Napleton's Car Rental Center's ("Napleton") Claim for Lost Profit Damages. DE 145. The Court has carefully considered the Motion, Napleton's Response thereto [DE 150], GM's Reply [DE 152], and the record and is otherwise fully advised in the premises. For the reasons set forth below, the Motion for Partial Summary Judgment is **GRANTED**.

      **I. PROCEDURAL BACKGROUND**

  The instant Motion for Partial Summary Judgment is the second summary judgement motion that GM has filed in this litigation. The Court denied GM's first such motion on October 30, 2020, and, at the same time, denied GM's Motion to exclude the opinions of Napleton's expert Alan Barbee, granted Napleton's Motion to strike in part the report of GM's expert Brian Gaspardo, and denied without prejudice GM's Motion *in Limine*. DE 106; DE 107. This Order

presupposes a certain level of familiarity with those Orders and, more generally, with the background of this case. However, an explanation of the arguments that GM previously made as to Napleton's lost profit damages and of the Court's rulings on those arguments will assist in understanding why the Court permitted GM to file a second summary judgment motion and why Napleton is incorrect that GM raises only issues that the Court has already decided.

GM raised four arguments in its initial Motion for Summary Judgment specific to Napleton's lost profit damages. First, GM contended that Napleton had not pled lost profit damages at all: "Napleton's never sought lost profits from GM in its Second Amended Complaint and does not allege that GM's alleged breach caused Napleton's to go out of business. It explicitly limits its damages to the value of incentives, and loss in value of non-risk inventory." DE 85 at 18. Napleton's requested relief in the Second Amended Complaint was in the form of "the value of the incentives that were never paid to Napleton," "losses [Napleton] suffered liquidating vehicles it had to hold onto when it became apparent GM would not deliver the 2016 model year vehicles it promised," and "the value of the non-risk vehicle inventory that Napleton could not find elsewhere." DE 106 at 16 (quoting DE 50 ¶¶ 73, 82, 92). The Court did not take a position as to whether Napleton could recover a category of damages that it had not pled, as neither party had briefed that issue.

GM's second argument as to lost profit damages was that certain individuals—individuals whom Napleton had sued in state court and some of whom were being criminally prosecuted—caused Napleton to lose profits:

> Napleton's claim for lost profits against GM ignores the impact of the misconduct and potentially criminal behavior of [Rick] Boyce and [Amanda] Homyak, and their theft of Napleton's customer lists, assets, financial information and subsequent criminal prosecution. Napleton's apparently also does not attribute any of its losses

> to the actions of the other State Court Defendants despite the eleven claims for relief against the State Court Defendants.

DE 85 at 18 (citation omitted).  The Court pointed out that the state civil and criminal proceedings were ongoing and that GM had not briefed whether any allegations, admissions, or findings in those proceedings would be binding in this litigation or would demonstrate as a matter of law that GM did not cause lost profits.  DE 106 at 17.

Third, GM asserted that "Napleton's own 30(b)(6) deponent testified that it never experienced any lost profits."  DE 85 at 19.  The Court stated that the deposition testimony cited for this proposition did not, in fact, support the proposition.  DE 106 at 17 (citing DE 86-21 at 4-5). Fourth and finally, GM argued that Napleton could not recover lost profits because it had failed to mitigate its damages: "Rather than take immediate action and reach out to GM regarding the availability of vehicle inventory to support its alleged need, Napleton's waited until August 2016 to alert GM."  DE 85 at 19.  The Court concluded that GM had not shown that there was no genuine issue for trial on the matter of mitigation because GM did not

> provide evidence on such issues as when Napleton discovered that the cars it purportedly had ordered would not arrive, what Napleton might have done at that time to mitigate its losses, what GM could or would have done had it been alerted to the issue earlier, or whether Napleton could have mitigated its losses in whole or only in part.

DE 106 at 17-18.  Thus, to the extent that Napleton was claiming damages for lost profits, GM did not establish its entitlement to summary judgment on that category of damages.

While it had not explicitly pled lost profits in the Second Amended Complaint, Napleton had provided an expert report of Alan Barbee, who opined that Napleton suffered lost profit damages of either $7.4 million or $6.1 million.  DE 87-1.  GM moved to exclude Mr. Barbee's opinions, arguing that the opinions failed to take into account various factors other than GM's

3

actions that, according to GM, were the actual causes of loss to Napleton. DE 87. It its Order on the Motion to Exclude, the Court pointed out that, by Napleton's and Mr. Barbee's own admissions, Mr. Barbee had not been retained to opine on the cause or causes of Napleton's damages; rather, he had accepted a proffered set of facts and had calculated damages based on those facts. The Court explained that GM had the ability at deposition and at trial to examine Mr. Barbee as to how other facts, if found by the jury, would impact his damages calculations and had the ability to call a rebuttal expert. But Mr. Barbee's opinions were not rendered inadmissible because he did not accept GM's version of the facts and then calculate damages based on *those* facts. Thus, the Court denied GM's Motion to Exclude Mr. Barbee's opinions. DE 107 at 1-4.

Following its October 30, 2020 rulings, Napleton moved for leave to amend the Second Amended Complaint to include an explicit claim for lost profit damages, and the Court held a status conference to discuss the Motion as well as a plan to prepare this case for trial. DE 113. The Court subsequently granted Napleton leave to amend, finding that GM had been aware, through Mr. Barbee's report as well as other discovery responses, that Napleton was seeking damages for lost profits. DE 119. Given this amendment, however, the Court believed that it was fair to grant GM supplemental discovery on the topic of lost profits, which GM had requested in the event that Napleton was granted leave to amend. Thus, the Court set an abbreviated schedule for limited additional discovery and required the parties to, upon the completion of discovery, apprise the Court as to whether they sought leave to file further summary judgment motions or motions *in limine*.

Napleton filed a Third Amended Complaint that included a request for relief in the form of "damages associated with lost profits resulting from the breach and subsequent closure of

Napleton's business," and the litigation proceeded through supplemental discovery. DE 121 ¶¶ 73, 82, 92. Napleton then filed a notice explaining that it did not intend to seek leave to file a summary judgment or motion *in limine*, and GM filed a notice seeking leave to file a partial summary judgment motion on Napleton's claim for lost profits and to file a second motion to exclude Mr. Barbee's opinions. DE 136; DE 139. The Court held an additional status conference. During the status conference, the Court addressed confusion between the parties as to whether Napleton now intended to offer Mr. Barbee as an expert on the cause of Napleton's damages. Napleton clarified that it "was not offering Mr. Barbee as an expert on anything other than his calculation of [Napleton's] damages." *See* DE 144 at 2. Given this clarification, GM withdrew its request for leave to file a second motion to exclude Mr. Barbee's opinions, and the Court memorialized this understanding in an Order. *Id.* ("Mr. Barbee is therefore not offered as an expert on the cause of [Napleton's] damages."). The Court granted GM's request for leave to file a partial summary judgment motion but expressed its expectation that "the motion will not contain arguments and evidence that [GM] presented in [its] original Motion for Summary Judgment." *Id.* at 1.

The Motion for Partial Summary Judgment that is presently before the Court followed. The Motion seeks summary judgment only as to lost profit damages and not as to the other categories of damages that Napleton continues to seek.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A factual dispute is 'material' if it would affect the outcome of the suit under the governing law, and 'genuine' if a reasonable trier of fact court return judgment for the non-moving party."

*Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008). A court ruling on a summary judgment motion views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016). The court does not weigh conflicting evidence or make credibility determinations. *Id.* When the non-moving party bears the burden of proof on an issue at trial, the moving party discharges its initial summary-judgment responsibility by showing that there is an absence of evidence to support the non-moving party's case. *Gonzalez v. Lee Cnty. Hous. Auth.*, 161 F.3d 1290, 1294 (11th Cir. 1998). Upon discovery of a genuine dispute of material fact, the court must deny summary judgment and proceed to trial. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012).

If the movant shows that there is no genuine dispute as to a material fact, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial. *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018). The non-moving party does not satisfy this burden "if the rebuttal evidence is merely colorable, or is not significantly probative of a disputed fact." *Jones*, 683 F.3d at 1292 (quotation marks omitted). "Conclusory allegations and speculation are insufficient to create a genuine issue of material fact." *Glasscox v. City of Argo*, 903 F.3d 1207, 1213 (11th Cir. 2018). The non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Jones*, 683 F.3d at 1292 (quotation marks omitted).

### III.   ANALYSIS

GM seeks summary judgment on Napleton's claim for lost profit damages on several grounds. According to GM, Napleton lacks any specific evidence, even after supplemental

discovery on the matter, that GM's alleged actions—diverting cars that Napleton had ordered to a newly formed competitor rental car company—caused Napleton to lose profits. A conclusion that GM caused lost profits, and a conclusion as to the amount of any lost profits, would be purely speculative. Further, the lost profits that Mr. Barbee calculates in his expert report were not foreseeable; GM could not have foreseen at the time that it purportedly contracted with Napleton in 2015 that a breach of the contract could subject GM to paying millions of dollars for lost profits through the year 2033. In addition, evidence exchanged during supplemental discovery establishes that Napleton failed to mitigate its damages by, for example, acquiring other cars from GM or an alternative car manufacturer and eliciting business from existing and new customers. Finally, even if Napleton can proceed to trial on its claim of lost profit damages, such damages are unavailable as a matter of law for the promissory estoppel cause of action pled as Count 3 in the Third Amended Complaint.

Napleton responds that GM raises only issues that the Court has already decided. Further, the record contains sufficient evidence for a trial on the issues of whether GM caused Napleton to lose profits, the amount of such lost profits, the foreseeability of lost profits, and whether Napleton mitigated its damages. Finally, state law has not definitively resolved whether lost profit damages are available for a promissory estoppel claim.

Beginning with the matter of choice of law, GM argues that Florida law governs Napleton's claim for lost profits. Napleton asserts that whether Florida or Michigan law governs is an open question but cites to Florida law throughout its Response because, according to Napleton, the relevant Florida and Michigan law is substantially the same. *Cf. Cavic v. Grand Bahama Dev. Co.*, 701 F.2d 879, 882 (11th Cir. 1983) (stating that, when parties do not raise a conflict of law

issue, a court should apply the substantive law of the forum state in the absence of facts justifying application of the law of some other jurisdiction). Thus, the Court proceeds to evaluate the parties' arguments in the context of Florida law.

Under Florida law, the measure of a buyer's damages for a seller's breach of a contract for the sale of goods is typically the difference between the market price of the goods when the buyer learned of the breach and the contract price, together with incidental and consequential damages, less expenses that the buyer saved. *HGI Assocs., Inc. v. Wetmore Printing Co.*, 427 F.3d 867, 878 (11th Cir. 2005). Lost profits may be awarded under the category of consequential damages. *Id.* To recover lost profit damages, the party must prove "breach of contract, that the party actually sustained a loss as a proximate result of that breach, that the loss was or should have been within the reasonable contemplation of the parties, and that the loss alleged was not remote, contingent, or conjectural and the damages were reasonably certain." *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1242 (11th Cir. 2009) (quotation and emphasis omitted).

The general rule in Florida is that "anticipated profits of a commercial business are too speculative and dependent upon changing circumstances to warrant a judgment for their loss." *Levitt-Ansca Towne Park P'ship v. Smith & Co.*, 873 So. 2d 392, 396 (Fla. 4th Dist. Ct. App. 2004) (quotation marks omitted); *see also HGI Assocs.*, 427 F.3d at 878 (recognizing Florida's general rule to avoid lost profit damages as too speculative and conjectural). However, lost profits are recoverable if they can be proven with "a reasonable degree of certainty." *Levitt-Ansca*, 873 So. 2d at 396 (quotation marks omitted); *see also Proudfoot Consulting*, 576 F.3d at 1243 ("Although, under Florida law, uncertainty as to the precise amount of the lost profits will not defeat recovery so long as there is a reasonable yardstick by which to estimate the damages, causation must be

8

proved with reasonable certainty." (quotation marks omitted)); *HGI Assocs.*, 427 F.3d at 879 (stating that the amount of lost profit damages must be capable of being adequately determined by "some standard" but need not be proven with "mathematical precision"). "The mind of a prudent impartial person should be satisfied that the damages are not the result of speculation or conjecture." *Levitt-Ansca*, 873 So. 2d at 396 (quotation marks omitted).

To ascertain how courts apply this "reasonable degree of certainty," "reasonable yardstick," and "some standard," language, the Court examines, as examples, two cases on which the parties heavily rely. GM cites to *Levitt-Ansca Towne Park Partnership v. Smith & Co.* In that case, a developer entered into a contract with a contractor to perform earthwork at a construction site, including the removal of "surplus fill." *Id.* at 394. The contract permitted the contractor to keep any surplus fill not needed for the construction project, and the contractor intended either to sell that residue surplus fill or to use it for other projects. *Id.* The contractor later sued the developer for breach of the contract and claimed, among its categories of damages, lost profits for lost sales of surplus fill. *Id.* at 395. On appeal following trial, the appellate court determined that lost profits for the surplus fill were too speculative to support a damages award:

> The contract provided neither a guarantee of the amount of surplus fill that the contractor might expect nor did the developer agree to a specified sum. Indeed, the contract defined surplus fill as that which was "not needed for the Project." The contractor never completed the project. Thus, its proof came in the form of an estimation, not reality.

*Id.* at 396. For this and other reasons, the appellate court reversed and remanded the case. *Id.* at 397.

For its part, Napleton relies on *Hartford Casualty Insurance Co. v. Intrastate Construction Corp.*, No. 10-61064, 2015 WL 13402421 (S.D. Fla. Apr. 27, 2015). In that case, an insurance

9

company contracted with a construction company to provide surety bonds for construction projects. *Id.* at *1. When the insurance company refused to issue further bonds due the construction company's financial difficulties, the construction company sued for breach of contract, asserting that a lack of bonding had put it out of business and seeking lost profit damages for projects it maintained it was unable to secure due to the lack of bonding. *Id.* at *2. The district court rejected the insurance company's argument that lost profit damages were too speculative and denied the insurance company summary judgment. *Id.* at *4. The district court explained that the construction company's opposition to the summary judgment motion contained "an itemized listing of the projects on which [it] contends it would have realized a profit, as well as the basis for the amounts listed," including the profits realized by the non-party that had been awarded the projects. *Id.* at *3-4. These figures provided a sufficient basis for a jury to calculate lost profit damages to a reasonable degree of certainty. *Id.* at *4.

In addition to these two cases on which the parties rely, the Court has reviewed Florida caselaw involving claims for lost profit damages resulting from alleged lost customers. In *Douglass Fertilizers & Chemical, Inc. v. McClung Landscaping, Inc.*, for example, an appellate court determined that lost profits were too speculative and remote when a customer ceased doing business with a sod supplier who delivered sod that was defective due to the defendant's fertilizer and herbicide treatments. 459 So. 2d 335, 336-37 (Fla. 5th Dist. Ct. App. 1984). The appellate court explained that the supplier sought to recover loss of future business with the customer, but there was no binding contract for the customer to buy more sod, there was no agreed upon price for more sod, and the testimony was "somewhat dubious" as to why the customer refused to do further business with the supplier. *Id.* at 337. Similarly, in *Paul Gottlieb & Co. v. Alps South*

*Corp.*, an appellate court concluded that lost profits were too speculative when a producer of fabric liners for prosthetic devices received defective fabric from a supplier and thereafter had to destroy 4,249 liners. 985 So. 2d 1, 9 (Fla. 2d Dist. Ct. App. 2007). While the trial court had awarded lost profits for each liner destroyed, the appellate court stated that the award was "improper because it merely reflected the units that were in [the producer's] inventory—it was not based on relevant marketplace considerations including, but not limited to, data on open orders that could not be immediately filled." *Id.* In *R.A. Jones & Sons, Inc. v. Holman*, however, an appellate court determined that lost profits were recoverable and not speculative when two farm organizations that had previously done business with a supplier of irrigation systems purchased irrigation systems elsewhere after it was discovered that the supplier's systems were made with the defendant's malfunctioning engines. 470 So. 2d 60, 69-70 (Fla. 3d Dist. Ct. App. 1985). The appellate court explained that the lost profits "to be derived from the unconsummated sale of two irrigation systems to two committed and long-standing customers was capable of being proved by competent evidence to a reasonable certainty." *Id.* at 70.

With this caselaw in mind, the Court examines the record evidence relevant to Napleton's claim for lost profit damages. The Court views Napleton's claim for such damages as based on two related theories. First, Napleton contends that it lost profits because it had to turn away customers when it lacked rental cars in its inventory due to GM's failure to deliver cars. Second, Napleton argues that GM diverted the cars that Napleton should have received to a newly formed competitor rental car company, that this competitor was able to become established as a viable business due to its receipt of these cars, and that the establishment of the competitor caused

11

Napleton to lose customers and profits. The Court examines each theory and the record evidence that Napleton points to in support of the theory.

### A. Customers Turned Away

Napleton cites to Paragraph 93 of its Statement of Material Facts to support its argument that it had to turn away customers because it lacked rental cars. Paragraph 93 cites to deposition testimony of Napleton's COO Bruce Etheridge and of employee Erik Lowery. DE 151 ¶ 93. Mr. Etheridge testified that "there were some people that came down for daily rentals that we turned away." DE 151-1 at 3 ("And there were some daily rental customers that came in. And we just couldn't rent to the customers because we had no idea what was going on. We didn't know where the cars were."). He recalled an instance when he was at the company's location one day in February of 2016 for between one and two hours and saw "two people coming in" who could not be rented cars. *Id.* He testified that it was "a busier time for us" and that there would be "rental customers coming in off the street." *Id.* Mr. Lowery testified that Napleton "[m]ost certainly" had to "turn customers down because [it] didn't have enough inventory" during the fall of 2016. DE 151-20 at 9.

This testimony creates a genuine issue as to whether Napleton lost profits because it needed to turn customers away due to a lack of rental cars. A jury could find that Napleton had to turn away at least two customers. However, Napleton points to no evidence providing a number, or even a rough estimation, of the customers turned away. Napleton points to no evidence to indicate—even for the two potential customers Mr. Etheridge witnessed being turned away—how long the customers who were turned away might have rented cars or what they might have paid to

12

Napleton for rentals. Napleton has come forward with no evidence by which a jury could calculate to any degree of certainty the profits that Napleton lost when it turned away customers.

This case is similar to *Levitt-Ansca*, where lost profits for the surplus fill were not recoverable because there was no method to calculate the quantity of surplus fill that was lost. 873 So. 2d at 396. So too here, Napleton has come forward with no evidence to indicate the number of customers that it lost. This case is also similar to *Douglass Fertilizers* and *Paul Gottlieb*, where there was no data by which to calculate lost profits such as some commitment to do business or an agreed upon price. *Douglass Fertilizers*, 459 So. 2d at 337; *Paul Gottlieb*, 985 So. 2d at 9. Similarly, Napleton has not presented any evidence to indicate how much profit it might have realized from the customers who were turned away. This case is markedly distinguishable from *Hartford Casualty* (where lost profits for identifiable construction projects could be calculated based on the profits realized by the party awarded the projects) and from *R.A. Jones* (where lost profits could be calculated for an identifiable quantity of goods to an identifiable number of long-standing, committed customers). *Hartford Casualty*, 2015 WL 13402421, at *4; *R.A. Jones*, 470 So. 2d at 70.

Napleton argues that its claim for lost profit damages should not fail because it has not come forward with the names of customers who were turned away or the dates on which they were turned away. While Florida caselaw does not require that level of precision, it does require there to be some standard to determine lost profits to a reasonable degree of certainty. Yet, Napleton has pointed to no evidence by which a jury could determine to any degree of certainty the profits lost from customers who were turned away. Based on the record evidence, any award of lost profit damages would be speculative.

Napleton also argues that its rental tracking system tracked only cars that were rented, not potential rentals that did not occur. Nevertheless, GM has shown an absence of evidence supporting lost profits, and Napleton therefore bears the burden to come forward with evidence showing that there is a genuine issue for trial on lost profit damages. *See, e.g.*, *Shaw*, 884 F.3d at 1098; *Gonzalez*, 161 F.3d at 1294. Napleton has not satisfied that burden with respect to lost profits from customers turned away due to a lack of rental cars.

### B. Establishment of a Competitor

Napleton's second theory as to lost profits is that it lost customers to a newly formed competitor rental car company, Custom Fleet Services d/b/a/ Auto Rentals of the Palm Beaches ("Auto Rentals"). According to Napleton, Auto Rentals received the cars that Napleton ordered and, had Auto Rentals not received those cars, it could not have become established as a viable busines and competitor.

To support this argument, Napleton points to evidence indicating that, if Auto Rentals had not received the GM cars intended for Napleton and instead had needed to order its own GM cars, its order essentially would have been placed at the end of GM's lineup of orders and would not have been fulfilled in time for the busy Florida rental season beginning in late 2015. *See, e.g.*, DE 151 ¶¶ 11, 78; DE 151-20 at 6 (deposition testimony that "there's certain windows, and you just can't order a car and it shows up the next week"); DE 151-26 at 5 (deposition testimony that, "If we were to cancel those orders, we would lose the production timing in our system."); DE 151-27 at 3 (deposition testimony affirming that "by ordering the vehicles with Napleton's [Fleet Account Number], you were able to get them in time for . . . the snowbird season for [Auto Rentals] to use"). Napleton also points to evidence indicating that, after Auto Rentals entered the

14

market, Napleton's customer volume decreased. *See, e.g.*, DE 151 ¶¶ 75, 82; DE 151-20 at 8, 10 (deposition testimony that customer volume "was nowhere near the volume that the previous years had done" and that "the volume that we did when I was there was less than what they used to do").

Napleton does not contend that GM was contractually obligated not to provide cars to a competitor rental car company generally. Nor does Napleton contend that GM was contractually obligated not to provide cars to Auto Rentals specifically. Rather, Napleton maintains that GM breached a contract by failing to provide to Napleton the cars that Napleton ordered. The breach was lack of delivery of cars to Napleton; the breach was not delivery of cars to Auto Rentals. Had GM provided the cars that Napleton purportedly ordered to Napleton, and provided other cars to Auto Rentals, there would not have been a breach of contract.

Napleton's second theory of lost profits suffers from the same deficiency as the theory addressed above. Napleton has identified no evidence to indicate how many customers it was unable to service or how much profit it lost because it had an insufficient number of rental cars. Napleton points to no evidence to indicate how many customers who may have rented from Napleton instead rented from Auto Rentals. Napleton points to no evidence to indicate how much profit Auto Rentals made that may instead have gone to Napleton.[1]

In this way, this case is distinguishable from *Hartford Casualty*, a case that Napleton repeatedly cites. In *Hartford Casualty*, the claim for lost profits survived a summary judgment challenge because lost profits reasonably could be measured by the profits realized by a non-party for identifiable projects that might have been awarded to the construction company. 2015 WL

---

[1] Napleton also does not cite to any evidence to support a proposition that, had Auto Rentals not received GM cars for the Florida rental season beginning in 2015, it could not have ordered cars and become established as a viable rental car company for future rental seasons. Napleton does not seek lost profits only for the 2015-2016 rental season during which it alleges it lacked a sufficient number of rental cars. Napleton seeks lost profit damages through the year 2033.

15

13402421, at *4. Here, there is no evidence by which a jury could calculate to a reasonable degree of certainty the customers, sales, or profits that Napleton lost because it did not have the rental cars that it purportedly ordered and that GM instead delivered to Auto Rentals

Mr. Barbee's reports do not provide the missing causal connection. Mr. Barbee made lost profits calculations by analyzing Napleton's revenue and expenses before the alleged breach of contract and assuming that Napleton would have had similar revenue and expenses going forward. DE 151-7 ¶ 30 ("The analysis of lost profits, utilizing the before and after method, requires a comparison of the Plaintiff's operating results before the alleged acts to the operating results of the Plaintiff after the alleged acts to identify the amount of the lost revenue by assuming that the Plaintiff would have achieved similar operating results as it historically did, but for the alleged acts."); DE 151-24 ¶¶ 13, 14. Using this method, Mr. Barbee estimated Napleton's lost profits from 2015 through the year 2033. DE 151-7 ¶ 47. As Mr. Barbee is not tendered as a causation expert in this litigation, he is not offering an opinion on whether the lost profits that he estimated were caused by GM's failure to deliver the cars that Napleton alleges it ordered or by any other factor.

The Court concludes that Napleton has not satisfied its burden to come forward with evidence showing that a jury could find to a reasonable degree of certainty the profits that Napleton lost because it had to turn customers away due to a lack of rental cars in its inventory. Further, Napleton has not satisfied its burden to come forward with evidence showing that a jury could find to a reasonable degree of certainty the profits that Napleton lost because the cars that it purportedly ordered were instead delivered to Auto Rentals. A determination of what profits Napleton lost

because it did not receive the GM cars it alleges it ordered would be speculative and conjectural. Such lost profit damages are not recoverable under Florida law.[2]

Finally, the Court addresses Napleton's assertion that the Court already resolved this issue in its previous rulings. Napleton is incorrect. First, Napleton had not demanded lost profits as a form of relief in its Second Amended Complaint, had not, at the time of the Court's Orders, sought leave to amend its damages demand, and had not briefed the issue of whether it could recover a category of damages that it had not demanded. Thus, it was not clear that the issue of lost profits was even properly before the Court. Second, the Court's prior Order on summary judgment responded only to the four limited arguments that GM made as to lost profits in its Motion for Summary Judgment (that Napleton had not pled lost profit damages, that any lost profits were caused by individuals who were civil and criminal defendants in other proceedings, that Napleton's Rule 30(b)(6) deponent testified that there were no lost profits, and that Napleton failed to mitigate its damages). The Court did not rule on the broader issue addressed in this Order concerning whether there is sufficient record evidence to permit the recovery of lost profit damages. Third, the Court's prior Order on GM's Motion to Exclude Mr. Barbee's opinions responded only to GM's argument that Mr. Barbee's calculations failed to take into account alternative causes for Napleton's loss of profits. The Court stated that Napleton was not using Mr. Barbee to establish causation and that GM could question Mr. Barbee about how certain facts, if found by the jury, would impact his calculations. The Court did not previously rule on GM's current argument that there is no evidence by which to determine lost profits to a reasonable degree of certainty.

---

[2] Given this ruling, the Court need not address GM's alternative arguments that lost profits were not foreseeable, that Napleton failed to mitigate damages, and that lost profit damages are not recoverable under promissory estoppel.

## IV.     CONCLUSION

For the foregoing reasons, GM's Motion for Partial Summary Judgment on Plaintiff North Palm Motors d/b/a/ Napleton's Car Rental Center's Claim for Lost Profit Damages [DE 145] is **GRANTED**.

This case is referred to Magistrate Judge Shaniek M. Maynard for a settlement conference to be held as soon as is practicable.  Absent extenuating circumstances, the settlement conference shall be completed by the end of February 2022.  Judge Maynard will set the date and time of the settlement conference by separate order.  The parties shall file a joint notice of the outcome of the settlement conference within one (1) business day of the completion of the conference.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 3rd day of February, 2022.

_____
ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to: Counsel of Record